UNITED STATES DISTRICT COURT
for the
SOUTHERN DISTRICT OF NEW YORK

**09 CIV 2594**

------------------------------------X
EPIRUS CAPITAL MANAGEMENT, LLC, DODONA
I, LLC, and ALAN BRODY,

                    Plaintiffs,

          -against-

CITIGROUP   INC.,   CITIGROUP   GLOBAL
MARKETS  INC.,  OCTONION  I  CDO  CORP.,
HARDING ADVISORY LLC, WING CHAU, THOMAS
MAHERAS,   RANDOLPH   BARKER,   MICHAEL
RAYNES,   DONALD   QUINTIN,   NESTOR
DOMINGUEZ,  JOHN  FRONTERO,  and  DAVID
BUSHNELL,

                    Defendants.
------------------------------------X

Index No.:



VERIFIED COMPLAINT

     Plaintiffs, EPIRUS CAPITAL MANAGEMENT, DODONA I, LLC, and

ALAN BRODY, by LIEBERMAN BRODY LLP, their attorneys, complaining

of the defendants, respectfully allege as follows:

     1.   That, at all times heretofore mentioned, plaintiff,

EPIRUS CAPITAL MANAGEMENT, LLC ("EPIRUS"), was and still is a

foreign  limited  liability  corporation,  duly  organized  and

recognized  under  the  laws  of  the  State  of  Delaware having

permission and authority to conduct business in the State of New

York, and at all times served as investment manager of DODONA I,

LLC, making all investment and trading decisions on behalf of

DODONA I, LLC.

2.   That, at all times heretofore mentioned, the plaintiff, DODONA I, LLC ("DODONA"), was and still is a foreign limited liability corporation, duly organized and recognized under the laws of the State of Delaware having permission and authority to conduct business in the State of New York, which accepted subscriptions for interests from investors through subscription agreements governed by an operating agreement.

3.   That, at all times heretofore mentioned, the plaintiff, ALAN BRODY ("BRODY"), is a natural person who was and still is a resident and citizen of the State of New York, who maintains offices in the City, County and State of New York, and is the sole principal of EPIRUS, and managing member of DODONA, and made all investment decisions pertaining to the allegations set forth herein.

4.   That, upon information and belief, at all times heretofore mentioned, the defendant, CITIGROUP INC., was and still is a corporation duly organized and existing under and by virtue of the laws of the State of Delaware and licensed to operate in the State of New York with its principal executive offices located at 399 Park Avenue, New York, New York 10022.

5.   That, upon information and belief, at all times heretofore mentioned, the defendant, CITIGROUP GLOBAL MARKETS INC., is a wholly owned subsidiary of CITIGROUP INC., (hereinafter and at all times together known as "CITIGROUP"),

that was and still is a corporation duly organized and existing under and by virtue of the laws of the State of New York and licensed to operate in the State of New York with its principal executive offices located at 388 Greenwich Street, New York, New York 10013.

6. That, upon information and belief, at all times heretofore mentioned, the defendant, OCTONION I CDO CORPORATION ("OCTONION"), was and still is a corporation duly organized and existing under and by virtue of the laws of the State of a Delaware, and licensed to operate in the State of Delaware, with its principal executive offices being unknown, C/O The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

7. That, upon information and belief, at all times heretofore mentioned, the defendant, HARDING ADVISORY LLC ("HARDING"), was and still is a limited liability corporation duly organized and existing under and by virtue of the laws of the State of a Delaware, and licensed to operate in the State of New York, with its principal executive offices located at 2 World Financial Center, New York, New York 10281.

8. That, upon information and belief, at all times heretofore mentioned, the defendant, WING CHAU ("CHAU"), is a natural person of an unknown address. CHAU was President of HARDING at all times complained of herein, and was responsible

for overseeing the selection and monitoring of the collateral portfolio comprising OCTONION.

9. That, upon information and belief, at all times heretofore mentioned, the defendant THOMAS MAHERAS ("MAHERAS"), is a natural person of an unknown address. MAHERAS was Co-President of CITIGROUP at all times complained of herein. MAHERAS oversaw CITIGROUP's trading and bond operations, including the mortgage-related trading division known as the Fixed Income Global Structured Credit Products Group. This is the trading division which was responsible for acting as the initial purchaser of the secured notes and Placement Agent for the income notes in the packaging and sale of OCTONION.

10. That, upon information and belief, at all times heretofore mentioned, the defendant RANDOLPH BARKER ("BARKER") is a natural person of an unknown address. At all times complained of herein, BARKER, who was employed as Co-Head of Global Fixed Income at CITIGROUP, assisted defendant MAHERAS in overseeing CITIGROUP's mortgage-related securities business.

11. That, upon information and belief, at all times heretofore mentioned, the defendant MICHAEL RAYNES ("RAYNES") is a natural person of an unknown address. At all times complained of herein, RAYNES was employed as the head of the Structured Credit Division at CITIGROUP, and was responsible for the CDO Trading Division at CITIGROUP.

12. That, upon information and belief, at all times heretofore mentioned, the defendant DONALD QUINTIN ("QUINTIN") is a natural person of an unknown address. At all times complained of herein, QUINTIN was employed as the co-head of the CDO Trading Division at CITIGROUP.

13. That, upon information and belief, at all times heretofore mentioned, the defendant NESTOR DOMINGUEZ ("DOMINGUEZ") is a natural person of an unknown address. At all times complained of herein, DOMINGUEZ was employed as the co-head of the CDO Origination Division at CITIGROUP.

14. That, upon information and belief, at all times heretofore mentioned, the defendant JOHN FRONTERO ("FRONTERO") is a natural person of an unknown address. At all times complained of herein, FRONTERO was employed as a salesman in the CDO Sales Division at CITIGROUP.

15. That, upon information and belief, at all times heretofore mentioned, the defendant DAVID BUSHNELL ("BUSHNELL"), is a natural person of an unknown address. At all times complained of herein, BUSHNELL, was employed as Senior Risk Officer of CITIGROUP.

<u>JURISDICTION AND VENUE</u>

16. This action arises under Sections 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and §§78t(a), and 17 C.F.R. §240.10b-5.

17.  This Court has subject-matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

18.  Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391. Many of the acts and practices complained of herein, including the misrepresentations and schemes alleged herein, occurred entirely or in substantial part in this District and CITIGROUP's principle executive offices are located in this District.

19.  In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States' mail, and interstate telephone communications.

## NATURE OF THE ACTION

20.  Plaintiffs collectively, by and through plaintiff BRODY, for their Complaint, allege the following upon personal knowledge as to their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on a review and analysis of: (1) marketing materials (2) an offering circular, (3) analyst reports concerning OCTONION; (4) subscription documents and contracts; (5) newspaper and magazine articles (and other media coverage) regarding CITIGROUP, its business or of any defendant; (6) the books and records of plaintiffs EPIRUS and DODONA; and (7) direct

communication between the parties.  Many of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their custody and/or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

21.  This is a action brought on behalf of plaintiffs for acts and omissions that have transpired by and between plaintiffs and defendants herein, in the time period beginning in or about January of 2007, continuing to and including November of 2007.

22.  BRODY formed EPIRUS and DODONA in 2007 for the purpose of acquiring mortgage-backed securities known as collateralized debt obligations ("CDOs") underwritten by large multinational banks such as CITIGROUP.

23.  The opportunity to invest with CITIGROUP in the highly sophisticated, high-finance world of CDOs was unique to those investors who had the background and connection to the managers and salesman on the CDO trading desk at CITIGROUP. This is evidenced by the Offering Circular for OCTONION dated March 2, 2007, which states at Page *iv* that:

> This Offering Circular has been prepared by the Co-Issuers solely for use in connection with the proposed offering of the Notes and the listing of the Listed Notes described herein. This Offering Circular is personal to each offeree and does not constitute an

offer to any other Person or to the public generally to subscribe for or otherwise acquire securities. Distribution of this Offering Circular to any other Person other than the offeree and any Person retained to advise such offeree with respect to its purchase is unauthorized, and any disclosure of any of its contents, without the prior written consent of the Issuer, is prohibited. Each prospective investor, by accepting delivery of this Offering Circular, agrees to the foregoing and to make no copies (paper or electronic) of this Offering Circular or any documents referred to herein.

24. Plaintiff BRODY had a unique relationship to the defendants employed at CITIGROUP given BRODY's employment history. BRODY was employed as the head trader of CITIGROUP's Asset-Backed Securities Desk and remained in the Mortgage Trading Division until 2000. At all times heretofore mentioned, BRODY had a unique and long standing relationship with CITIGROUP and its employees, based on his past employment and continued contact with defendants, including QUINTIN and FRONTERO. Furthermore, when BRODY was employed at CITIGROUP, defendant MAHERAS was the Head of Fixed Income, just as he was during the period complained of herein. During the time that BRODY was employed at CITIGROUP, he indirectly reported to MAHERAS, and was well known to him. Further, MAHERAS was also ultimately responsible for BRODY's compensation. Given such factors as BRODY's professional connection to defendants, BRODY was offered an investment opportunity underwritten by CITIGROUP that otherwise would not have been made available to him or to others. Without such a connection to defendants, there would

have been little to no known access to the market for CITIGOUP-underwritten CDOs - a market whose valuation has been revealed to have been severely inflated during the years in which it blossomed and then suddenly died.

25. CITIGROUP helped create what has turned out to be a hyper-inflated CDO market. The underwriting activity earned substantial fees for CITIGROUP. CITIGROUP used inflated, unreliable, and unsupportable valuations of the CDOs it sold to investors such as BRODY, in order to keep its CDO market alive and thriving. In valuing its assets inaccurately, CITIGROUP, perpetrated a Ponzi-style scheme that gave the appearance of a healthy asset base, and therefore allowed CITIGROUP to continue to benefit from the illusion of the blossoming market.

26. From February of 2007 through November of 2007, CDO securities purchased by plaintiffs from CITIGROUP were artificially inflated as a result of Defendants' dissemination of false and misleading statements and deceptive acts, which included:

(a) A scheme to defraud investors, specifically plaintiffs, by misrepresenting and concealing that it cleaned out its warehouse of largely worthless CDO "spare parts" and reused them in a last round of securitizations and re-securitizations involved in the funding of OCTONION;

(b)  The overvaluing of previously-underwritten mortgage-backed securities held as assets on CITIGROUP's balance sheet based on intentionally misleading and overly optimistic valuation models that were used in the creation of its CDO underwriting deals;

(c)  The intent to defraud and/or mislead investors as to the true value of OCTONION by artificially inflating the price of those securities when providing "mark-to-market" valuations to prospective and current purchasers of OCTONION, namely BRODY;

(d)  The overt act of providing a false mark and subsequently utilizing stall tactics by failing to provide a bid for OCTONION. Thus, plaintiffs were held hostage in OCTONION, because they were unable to sell their position in OCTONION. Ultimately, when a bid was provided it was entirely inconsistent with even the false mark that had been provided;

(e) CITIGROUP's intentional fraud on plaintiffs by underwriting OCTONION with the dual purpose of removing worthless assets from its books from previous deals, while simultaneously generating enormous underwriting fees for itself in a Ponzi-like scheme to which BRODY fell victim.

27.  CITIGROUP orchestrated its massive scheme because a bubble had been created in the world of high finance.  In order to conceal the true value of the underlying collateral assets consisting of poorly rated mortgage-backed securities that were

either held on CITIGROUP's balance sheet awaiting sale, or were already off-loaded to investors, CITIGROUP lied about those valuations. During the relevant time period that plaintiffs fell victim, CITIGROUP passed undue risk onto plaintiffs by creating a multi-billion dollar market in CDOs that served to unjustly enrich CITIGROUP at grave cost to victim-investors such as plaintiffs.

28. As CITIGROUP accumulated unsold CDOs (which constituted very risky assets on their books) they went on to create new and additional CDOs. In the case of OCTONION, a substantial portion of the assets in OCTONION came from CITIGROUP's warehouse of unsellable CDO leftovers. During the process of underwriting new deals by using these old assets, CITIGROUP provided model stress analyses that were fraudulently designed to make the securities look attractive under any scenario.

29. CITIGROUP's CDO machine accelerated to the point that its risk controls were negligent, and defendants, including MAHERAS, BARKER, RAYNES, QUINTIN, DOMINGUEZ, FRONTERO, and BUSHNELL, lacked clear lines of reporting. CITIGROUP was able to underwrite mortgages and CDO deals with no concern for underwriting guidelines or a basis for legitimate valuations. The structural organization within CITIGROUP did not promote independence between deal underwriting and trading through

proper risk management.

30. When it became known internally to CITIGROUP's managers that the consequences of faltering CDO ownership and defaults in subprime mortgages were no longer in some distant future but rather, were imminent, defendants continued to (a) inflate the value of OCTONION that it sold to plaintiffs, and (b) ultimately employ stall tactics when plaintiffs requested a bid on OCTONION. This scheme prevented plaintiffs from selling, and as such, CITIGROUP was afforded the ability to keep its faltering assets in the hands of plaintiffs while the bottom dropped out from under the CDO market.

31. CITIGROUP's senior managers and salesmen, including but not limited to, MAHERAS, BARKER, RAYNES, QUINTIN, DOMINGUEZ, FRONTERO, and BUSHNELL, had a motive to participate in a scheme to provide inflated marks because of the financial gain to themselves over the interests of their investors and of society as a whole. Defendants "got addicted to the revenues and arrogant about the risks they were running... as long as you can grow revenues, you can keep your bonus growing." [1] As the CDO market bubble was deflating, CITIGROUP's gargantuan losses caused defendants to inflate the valuations for OCTONION, thereby offsetting CITIGROUP's own balance sheet and passing

---

[1] Eric Dash and Julie Creswell, "*Citigroup Pays for a Rush to Risk,*" The New York Times, November 23, 2008.

inexcusable risk onto plaintiffs.

32. To perpetuate this scheme, CITIGROUP used the veil of a third party manager named HARDING. HARDING is an entity which was seemingly employed to evaluate the assets used to fund OCTONION. On information and belief, CHAU, as president of HARDING, was ultimately responsible for selection of those assets. Rather than being diligent in their obligations, HARDING and CHAU failed to act independently of CITIGROUP's interest. HARDING, through CHAU's decision-making and relationship to CITIGROUP, placed unsellable assets from other CITIGROUP-sponsored CDOs into OCTONION, thereby assisting CITIGROUP in off-loading its junk onto plaintiffs' balance sheet.

33. CITIGROUP's agents provided inflated marks to give the appearance of a healthy market, to deceive plaintiffs and lead them to believe they had purchased assets worth what CITIGROUP claimed they were worth, and to ultimately avoid losses in CITIGROUP's own portfolio.

34. When plaintiffs asked CITIGROUP salesman FRONTERO to provide a bid on OCTONION, he stalled and connived plaintiffs to enter into a credit swap (for assets that were likely equally worthless). Though plaintiffs were wary enough not to engage in the swap, FRONTERO still delayed plaintiffs. FRONTERO avoided their requests for a bid, as requested and required for the

sale, and as such, FRONTERO effectively left plaintiffs holding OCTONION while he and the other defendants knew that the market was failing and mispriced.

35. Throughout the period that plaintiffs owned OCTONION, CITIGROUP continued to publish misleading positive research to perpetuate its scheme.

36. This scheme contributed substantially to the collapse of plaintiff BRODY's master fund, DODONA, and further caused irreparable harm to BRODY's reputation.

### WHAT IS A CDO?

37. A CDO is an asset-backed security backed by a portfolio of bonds or loans, which is created by banking institutions such as CITIGROUP. CDOs are created through the following steps: (a) a homeowner obtains a mortgage; (b) the lending institution sells that loan to a Wall Street firm, such as CITIGROUP, known as an underwriter; (c) the loan is then repackaged with other loans obtained by the underwriter; (d) the bundle of loans is then securitized for an offering to investors as a mortgage-backed security; and (e) these mortgage-backed securities are sold in the form of various commercial instruments.

38. Financial institutions bundle bonds or loans to form any given CDO, which is then "split" or "sliced" into several parts, known as investment tranches. The assets that backed

CITIGROUP's CDOs consisted of subprime mortgages. CITIGROUP pooled together thousands of these mortgages into a single CDO, whose debt, in turn, was issued to investors in different investment tranches.

39.   The credit risk of a CDO is divided among the different tranches. The CDO parts are then sold individually to investors as separate securities: (a) senior tranches (often rated AAA), (b) mezzanine tranches (often rated AA to BB), and (c) equity tranches, which are the most junior. Losses are applied in reverse order of seniority. Senior tranches carry the lowest risk of loss and lowest interest rate of return, and would thus be the highest rated class. Junior tranches carry the highest risk and highest interest rate, and would thus be most vulnerable because it is the first class to absorb losses. Rating agencies, like Standard & Poors ("S&P"), Moody's Investor's Service or Fitch Ratings, rate the securities comprising the tranches to let investors know the chances of default.

BACKGROUND ON SUBPRIME LENDING AND CITIGROUP'S INDUSTRY ROLE

40.   The boom years began in 2000. When the value of residential properties was on the rise and housing demand was up, mortgage-brokers and banks were all too eager to provide mortgages.  Throughout the good years, CITIGROUP was an industry leader in extending subprime mortgages and re-financings.

CITIGROUP also bought up billions of mortgage loans to fuel its ever increasing CDO business.

41.  From 2003 to 2005, CITIGROUP's business from issuing CDOs more than tripled from $6.28 billion to $20 billion. At that time, MAHERAS, BARKER, and others, helped transform CITIGROUP into one of the industry's biggest players. In 2005 alone, CITIGROUP generated fees to the tune of $500 million. CITIGROUP grew the CDO market and increased its income from fees, despite a subprime mortgage crisis that would eventually lead to billions of dollars of write-downs.[2] As will be described herein, not only wasn't CITIGROUP capable of properly overseeing billions of dollars worth of CDOs, CITIGROUP perpetuated a fraud on investors.

42.  When the volatility in the market leading to the subprime disaster began gaining national media attention, major Wall Street institutions began reporting significant losses on subprime mortgages as a result of expected higher default rates. With the prospect of increasing default rates, CITIGROUP's CDOs declined drastically in value, resulting in those CDOs being unable to return a payment of interest and/or principal to investors on the notes associated with the bonds.

43.  In late 2007, CITIGROUP finally began to reveal the

---

[2] ibid at p. 34

extent of its overvaluing of its mortgage-backed debt instruments, and was forced to write down billions of dollars of mortgage-backed debt instruments held on its balance sheet. As the market absorbed the truth about CITIGROUP's true financial condition, CITIGROUP's share price fell dramatically and the company lost tens of billions of dollars in market value. Before the market opened on November 5, 2007, CITIGROUP announced the replacement of its top management team and admitted at that time that it would have to take a write-off in excess of $10 billion in connection with its subprime business.

OCTONION I CDO

44. OCTONION is a CDO offered to select investors which was comprised of a portfolio of mortgage-backed assets. With regard to OCTONION, defendants participated in a course of conduct which constituted a fraudulent scheme. This was accomplished through their dissemination of materially false and misleading statements and their concealment of material adverse facts relating to OCTONION.

45. This scheme deceived subscribers of OCTONION with respect to CITIGROUP's business operations, management, earnings, and the intrinsic value of OCTONION securities. It caused plaintiffs to purchase OCTONION at artificially inflated prices even though defendants had fiduciary and contractual duties to legitimately value OCTONION, either by "marking-to-

market" or through a "fair value" system.

46. Marking bonds consists of collecting pricing information from the appropriate markets and exchanges when possible. Marking-to-market is the industry-wide custom of valuing assets and providing a mark once per month. When market pricing is not available for OCTONION, because there was no exchange or secondary market, CITIGROUP was obliged (even according to their terms) to value assets by discerning their fair-value. This method involves taking the present value of projected cash-flows over the life of an asset, and adjusting it based on credit-risk as determined by the management at CITIGROUP. As will be described herein, CITIGROUP's valuations were baseless.

47. CITIGROUP published and provided to plaintiffs marketing materials in and around January 2007, so that plaintiffs could determine their interest in investing in the Income Notes of OCTONION. To that end, CITIGROUP also published an Offering Circular. Ultimately, plaintiffs relied upon the representations made in the aforementioned documents, and signed up through a subscription agreement with CITIGROUP for the purchase of OCTONION. Plaintiffs paid three million ($3,000,000.00) dollars for the bonds prior to the closing date of March 6, 2007.

48.  The original marketing materials represented that HARDING's investment decisions, as made by its employees, namely CHAU, were based on legitimate analysis. Rather, HARDING and CHAU supported CITIGROUP in concealing waste in the OCTONION deal.  The OCTONION Marketing Book on page 1 states:

> Octonion I CDO, Ltd is a managed $1.0 billion asset-backed security ("ABS") CDO transaction that is able to invest in CDO securities using both the cash and credit default swap markets. The Collateral Manager is Harding Advisory LLC ("Harding"). The Portfolio is expected to have an average rating of [Baa2/Baa3]. The capital structure will be approximately 60% unfunded, providing investors with a more efficient execution of the senior risk. It is anticipated that 100% of the collateral in the Portfolio will be rated investment grade by Moody's at closing.

49.  The marketing materials on page 9 further represented that HARDING's investment objectives and approach to investing include "[i]nvest in high quality assets with stable returns and superior capital preservation profiles... [m]aximize returns and minimize losses through rigorous upfront credit and structural analysis, as well as ongoing monitoring of asset quality and performance... [e]mploy a top/down economic analysis to determine sector allocation... [p]erform a thorough bottom/up credit and structural analysis to identify individual investments... [a]nalyze historical spreads to optimize relative value... [c]omplete an in-depth credit review to determine the

suitability of each potential transaction in the context of the CDO... [a]ctively monitor delinquency and loss trends."

50. Given that reused assets were concealed inside of OCTONION, the representations by HARDING were never adhered to.

51. The recycled assets taken from CITIGROUP's warehouse of unsold waste left over from previous CITIGROUP-underwritten CDOs, which were reused and packaged inside of OCTONION, included: (a) $10,000,000 of Adam Squared 2007-2A class C, rated BAA2/BBB; (b) $10,000,000 of Class V Funding 2007-3A class C, rated BAA2/BBB; (c) $10,000,000 of 888 Tactical Fund 2007-1A class C, rated BAA2/BBB; and (d) $3,724,626.13 of TopG 2005-1A class C, rated BAA2/BBB.

52. HARDING and CITIGROUP were responsible for this concealment.

53. Prior to the closing date of the deal, as part of its marketing of OCTONION to plaintiffs, CITIGROUP provided plaintiffs with a summary of assets that would be included in the original portfolio for OCTONION. Notably missing from those materials was reference to the four previously-owned CITIGROUP-underwritten CDOs mentioned above. These four securities were placed in OCTONION sometime between the emailing of the marketing documents to plaintiffs, and the "ramp-up end date" of OCTONION.

54.   The "Ramp-Up End Date" was defined on page 5 of the Offering Circular, as the "earlier to occur of (i) the date 45 days following the Closing Date and (ii) the date on which [OCTONION] has acquired (or entered into agreements providing for the acquisition of) Eligible Collateral Debt Securities having a Principal Balance—Aggregate of at least the Principal Balance Target."

55.   Unlike the practice at other financial institutions, also notably missing from the Offering Circular is any detail delineating the specific eligible collateral to be purchased to fill OCTONION, including the four CDOs mentioned above.

56.   The OCTONION offering circular at page 21, provided that "[OCTONION] expects to continue to acquire Eligible Collateral Debt Securities after the closing date that, on a cumulative basis together with the Eligible Collateral Debt Securities purchased on the Closing Date, will have a Principal Balance—Aggregate of at least the Principal Balance Target as of the Ramp-Up End Date."

57.   At page *v* of the Offering Circular it is represented that:

> To the best knowledge and belief of the co-issuers, having taken all reasonable care that such is the case, the information contained in this offering circular is in accordance with the facts and does not omit anything likely to affect the import of such information.     The     manager     accepts

responsibility for the information contained in the sections entitled "The Manager" and "Risk Factors—CDO of ABS Experience; Dependence on Manager and Key Personnel Thereof; Relationship to Prior Investment Results" and "—Potential Conflicts of Interest Involving the Manager". To the best knowledge and belief of the Manager, having taken all reasonable care that such is the case, the information contained in the sections entitled "The Manager" and "Risk Factors—CDO of ABS Experience; Dependence on Manager and Key Personnel Thereof; Relationship to Prior Investment Results" and "—Potential Conflicts of Interest Involving the Manager" *is in accordance with the facts and does not omit anything likely to affect the import of such information* (emphasis added).

58.   In the section entitled, "CDO of ABS Experience; Dependence on Manager and Key Personnel Thereof; Relationship to Prior Investment Results" the Offering Circular at page 41 further states:

Because the composition of the Eligible Collateral Debt Securities will vary over time, the performance of the Eligible Collateral Debt Securities depends on the investment strategy and investment process of the Manager in analyzing, selecting and managing the Eligible Collateral Debt Securities. As a result, the performance of the Issuer will be highly dependent on the financial and managerial experience of certain investment professionals associated with the Manager to whom the task of selecting and monitoring the Collateral has been assigned or delegated. *Certain employment arrangements between those officers and employees and the Manager may exist, but the Issuer is not, and will not be, a direct beneficiary of such arrangements, which arrangements are in any*

> *event subject to change without the consent*
> *of the Issuer.* There can be no assurance
> that the Manager's current investment
> professionals will continue to be affiliated
> with the Manager or actively involved in the
> management and administration of the
> Collateral for the Issuer (emphasis added).

59. In spite of the representations made that risk factors would be assessed appropriately, actual portions of OCTONION were largely made up of CITIGROUP's own unsellable junk. HARDING, through CHAU as manager of the deal, knew it, or should have known about it. As such, and in violation of their own representations to the contrary, HARDING and CITIGROUP were direct beneficiaries of this improper arrangement.

60. CITIGROUP manufactured managers such as HARDING and CDOs such as OCTONION in order to ditch unsold waste from prior CITIGROUP securitizations. By the time plaintiffs purchased OCTONION, CITIGROUP's CDO underwriting was already a shell game. They knowingly dumped unwanted assets, of which Adam Squared 2007-2A, Class V Funding 2007-3A, 888 Tactical Fund 2007-1A and TopG 2005-1A were a subset, into new securitization vehicles, namely OCTONION. Each time CITIGROUP created a new CDO to purchase old debris from CITIGROUP's prior CDOs, it created a new set of unsellable securities.

61. On information and belief, CITIGROUP was responsible for selecting the collateral to be included in OCTONION. CITIGROUP instructed the CDO manager, HARDING, and HARDING's

President CHAU, to include collateral of CITIGROUP's choosing. Undisclosed to plaintiff until after their three million dollar investment was completed, the OCTONION deal contained $33,724,626.13 of CITIGROUP's own previously underwritten CDOs. Upon information and belief, these recycled assets were largely worthless at the time they were placed in OCTONION. The assets that HARDING and CITIGROUP selected between marketing the deal to plaintiffs and the end of the ramp up period, reveals their hidden agenda to find new buyers onto whom they could offload their waste.

62.  CITIGROUP specifically sent materials to plaintiffs prior to their purchase of OCTONION which indicated that the original OCTONION portfolio was comprised of assets valued at $947,386,528.00, (leaving plaintiffs with the belief at that time that CITIGROUP still had an obligation to fund $52,613,472.00 to complete its obligations). On information and belief, the original portfolio contained only one CITIGROUP-underwritten asset. Absent from these materials is any mention of the four prior CDOs.

63.  Plaintiffs entered the deal for OCTONION with the understanding that any collateral would be selected pursuant to the careful process delineated by defendants' own representations. Instead, CITIGROUP re-packaged assets from unsold portions of prior CDO underwritings, and hid them inside

of OCTONION. The four prior CDOs that were clearly recycled into OCTONION may not be the extent of defendants' attempt to conceal their scheme to hide their waste in exchange for underwriting fees and offloading of assets.

64. That the Offering Circular bears no mention of the details of the assets ultimately found in OCTONION, leaves defendants as the only parties in possession of the true make-up of OCTONION prior to its closing date, and what it would be once fully funded.

65. Furthermore, a review of the final portfolio constituting OCTONION, disseminated by defendants and obtained after plaintiffs purchase, reveals that the hidden assets represented more than half of the "unfunded" portion of OCTONION. In practice, HARDING, CITIGROUP, and the individual defendants, received huge underwriting fees for reusing old, largely worthless collateral. CITIGROUP further benefited by structuring the deal in this manner when $33,724,626.13 disappeared from CITIGROUP's own balance sheet and financial statements.

66. In addition to the Offering Circular disseminated to plaintiffs, CITIGROUP as "placement agent" for OCTONION, provided plaintiffs with a subscription agreement. By executing this subscription agreement, plaintiffs became legally bound, and in fact did subscribe and pay for OCTONION at a purchase

price of three million ($3,000,000.00) dollars prior to closing. The agreement provided that plaintiffs' subscription would be irrevocable prior to the closing date, unless the Offering Circular contains a change "on or prior to the Closing Date... that is materially adverse to the interests of a holder of a Subscribed Security."

67.  While CITIGROUP protected its interests by vetting out BRODY's suitability as a sophistical investor to purchase OCTONION, in practice, employees of CITIGROUP's Fixed Income Trading Group hid changes that created a "material adverse" effect to plaintiffs' interests. In saving disclosure of the largely worthless assets coming off of CITIGROUP's books for a time after plaintiffs were already bound to accept the purchased securities, CITIGROUP took advantage of a deceptive loophole of its own design.

68.  As a consequence of CITIGROUP, HARDING, and the individual defendants' deception, plaintiffs were rendered incapable of making an informed investment decision. Plaintiffs could not have known that OCTONION lacked the value CITIGROUP represented it had. Not only was plaintiffs' original subscription worth far less than the four million dollars[3] that CITIGROUP valued it at, CITIGROUP kept the market valuation of

---

[3]  Plaintiffs paid $3,000,000 for $4,000,000 worth of OCTONION notes, representing 75% of par.

OCTONION at an inflated level after the closing date. In doing so, CITIGROUP masked the fact that OCTONION was overvalued all along.

### FAKE AND INFLATED MARKS WERE PROVIDED TO BRODY

69.  In an email to BRODY on Tuesday, February 20, 2007, CITIGROUP salesman, FRONTERO, attached OCTONION materials, including the marketing book, an excel portfolio and analysis of equity cash flow, in which CITIGROUP represented:

> "The key to this portfolio is the make up of the ratings, with 50% of the assets rated Baa2, and only 40% at Baa3. The other feature of the collateral is in limiting the sub-prime bucket to 49%, and adding 41% of mid-prime assets in order to diversify away from 100% sub-prime risk. The attached cash flows are showing base case with equity at $100, at 0% CDR, showing 28% IRR. I can offer you this equity at $80, which is 36.40% IRR."

70.  On February 21, 2007 in another email to BRODY, FRONTERO agreed to a three million ($3,000,000.00) dollar price tag for OCTONION. Included in the email was pressure for BRODY to complete his own analysis due to investor interest in the equity portion of the bonds.

71.  On or about February 22, 2007, BRODY, on behalf of all plaintiffs, signed the "Master Repurchase Agreement" with CITIGROUP. In and around that time, BRODY executed the subscription agreement, described earlier. BRODY also completed an investor form on behalf of DODONA, delineating that the

principal amount of the income notes subscribed for was four million dollars, and BRODY's aggregate purchase price for same was three million dollars. Thus, the bonds had been marked by defendants with a valuation and bid price of 75% of par. The trade settled in or about April of 2007.

72. On May 10, 2007 CITIGROUP disseminated positive research via email to BRODY promoting the bonds. In a report entitled, "ABS CDOs in a Mezz?", CITIGROUP advertised that "opportunists have another chance now!" and stated the following:

> A direct fallout of the delinquency stories has been the dramatic pullback of investors participating in the ABS CDO markets (especially CDOs repackaging triple-B bonds of subprime mortgage securitizations or "Mezz ABS CDOs"), reminiscent of the sudden disruption that occurred in the corporate tranche markets in May 2005. At that time, following the downgrade of Ford and GM, much leveraged money (and the Street) lost their appetite for tranched risk and exited the market, suddenly leading to substantial spread widening in the first loss pieces of investment-grade portfolios. Many opportunists, some with little experience of tranche investing, swooped in and then exited their position in the space of a few months with large profits as the original participants returned to the markets.

> Opportunists have another chance now if they do their homework. Because of the market volatility of CDO warehouse portfolios and worries surrounding the US subprime housing sector, dealers rushed to price their CDOs in February and March of this year (see

Figure 1). The flurry of issuance however has led to the Street being long on tranches of these mezz ABS CDOs. The biggest casualty has been the mezz triple-B rated CDO tranches as they are often bought by other mezz ABS CDOs (whose issuance has all but died for the moment). Sharing the pain has been triple-B tranches of CDOs of ABS CDOs or CDO-Squareds. Meanwhile, bargain-hunters are bound to be tempted by headline spreads of 5% and 10% for single-A and triple-Bs, respectively, although these occur in a large range, as shown in our figure.

[table omitted]

The question for investors is whether the headline returns the promise of at least a reasonable degree of compensation. We argue in the rest of the paper that investors can find good deals if they do their credit work — even when they factor in robust housing stresses.

73. Plaintiffs confirmed with FRONERO and other members of CITIGROUP's mortgage research team that in fact this report used OCTONION as its model.

74. Meanwhile, on or about June 5, 2007, CITIGROUP saleswoman, Jessica Marino, emailed BRODY to inform him that the value of OCTONION's equity tranche as of May 31, 2007, was marked at 71.50% of par. This value represented a loss even though no bad news had been reported regarding OCTONION or the underlying collateral, and even as CITIGROUP was using OCTONION as the basis for positive research.

75. On or about June 7, 2007, BRODY requested a mark and bid price for OCTONION to access the liquidity of his

investment. Rather than provide a mark and bid, CITIGROUP stalled. Upon information and belief, FRONTERO was told by his managers at CITIGROUP to employ stall tactics and avoid bidding the bonds for sale.

76.   Instead, on or about June 15, 2007, FRONTERO emailed BRODY and proposed that plaintiffs engage in a trade swap for the equity tranche.  FRONTERO used an implied rate of return of 71.50% of par. BRODY did his own analysis of the proposed trade, found it to be faulty, and declined to enter into the proposed swap agreement.

77.   On or about June 30, 2007, FRONTERO provided a bid price for OCTONION at 38% of par, representing a loss to plaintiff of approximately half the purchase value paid for OCTONION within three months of the settlement date.

78.   On or about July 12, 2007, the ratings agencies began a massive downgrade of subprime securities.

79.   On August 2, 2007, the Wall Street Journal reported that Wall Street banks that were heavily involved in underwriting subprime securities, such as CITIGROUP, had losses hidden on their books and in off balance sheet vehicles.[4] During that month, CITIGROUP didn't bother to mark OCTONION for BRODY.

---

[4] "Subprime Detectives Search in Dark, for Next Victim -- Wall Street Can Bury Mistakes in Fine Print," by David Reilly and Karen Richardson, Wall St. J., Aug. 2, 2007.

80. On or about September 30, 2007, FRONTERO marked OCTONION at 10% of par.

81. The very next day, BRODY, asked for a bid. Upon BRODY's bid request, FRONTERO offered a bid of 1% of par, despite having marked the bonds at 10% of par the previous day.

82. In or about early October of 2007, BRODY called FRONTERO and confronted him as to the arbitrary and inflated marking system plaintiffs were being subjected to. FRONTERO responded with a bid of 3% of par. BRODY accepted to escape further losses. CITIGROUP then repurchased OCTONION, and paid plaintiffs one hundred-twenty thousand ($120,000.00) dollars, representing a substantial loss to plaintiffs.

83. The actual loss to plaintiffs in the six months they owned OCTONION was two-million eight-hundred eighty-thousand ($2,880,000.00) dollars.

84. Throughout the life of DODONA, CITIGROUP used a marking method to consistently inflate values and "smooth" returns. Through CITIGROUP's grossly negligent marking, bad-faith failure to provide a fair bid, and intentional pattern of self-interested misrepresentations and concealment, defendants availed themselves of the opportunity to conceal liquidity problems and poor performance in the subprime loan industry, while keeping revenues high for their own self-interest. The

inflated values generated an appearance of stability in the midst of a liquidity crisis being concealed by CITIGROUP.

85. CITIGROUP's actions caused the collapse of DODONA, untold harm to BRODY's reputation, and extensive emotional and personal suffering to BRODY.

## MOTIVATION TO DEFRAUD

86. Plaintiffs' purchase of the equity tranche of CITIGROUPS's offering represented the most sensitive piece of plaintiffs' investment in OCTONION and CITIGROUP was in a position to know this fact.

87. CITIGROUP built a scheme by disseminating lies and employing stall tactics. Unbeknownst to plaintiffs, this scheme was in play prior to their own purchase of OCTONION. Given BRODY's prior association with CITIGROUP, including OCTONION salesman FRONTERO, he was lulled into a false sense of trust and security. CITIGROUP schemed to hide its older, unsellable junior CDO tranches, and BRODY was set-up to take the worst of it given his investment in the equity tranche of the bonds.

88. As the CDO underwriter, CITIGROUP was responsible for structuring OCTONION into tranches based on modeling the expected loss of the underlying collateral. CITIGROUP directed the workings of this modeling. CITIGROUP's expected loss in their modeling was highly dependent on the assumption that housing prices would appreciate, so CITIGROUP used optimistic

housing price assumptions in constructing its CDOs. Such assumptions generated very low expected losses, which in turn determined the tranche structure of the securitizations (because each rated tranche was required to be removed by a certain degree, appropriate to its credit rating from that loss). Regardless of whether this assumption was warranted to begin with, at the time plaintiffs purchased OCTONION, it no longer matched the real world.

89. CITIGROUP was aware of plaintiffs' investment objective both from their prior history, as well as the fact that plaintiffs were required to provide CITIGROUP with DODONA and EPIRUS documentation.

90. Plaintiffs investment objective was to generate attractive risk-adjusted returns, with low correlations to equity and fixed income markets. This was to be sought through investments in the equity of mortgage related CDOs. An emphasis was placed on residual cash flows of various asset-backed and mortgage related collateral trusts, consisting mainly of the equity in CDOs. The DODONA Subscription Documents provided that the Fund's investment portfolio was concentrated in asset-backed CDO Equity rated BBB to BB-, and the capital structure of each transaction and determined stress scenarios would be evaluated by accessing asset risk, including default probability, default correlation and default severity.

91.  Plaintiffs equity tranche of the OCTONION deal made its investment particularly susceptible to market fluctuations, inaccurate and inflated marks and the ultimate fraud perpetrated by CITIGROUP. The equity tranche was the riskiest part of the CDO and the first tranche to be wiped-out by losses.

92.  CITIGROUP set up its CDOs so that they could work only under boom conditions. In fact, as CITIGROUP's analyses should have shown (and despite BRODY's attempts to command delivery of a thorough, realistic analysis), CDOS would be devastated at all levels even if housing prices did not actually decline, but simply failed to appreciate.

93.  Defendants knew that OCTONION could not withstand the conditions that became operative in early 2007.  At that time, any losses would deeply impair even the CDO's super senior tranches. Defendants knew that the expected losses under real world conditions would be far higher than the expected losses that CITIGROUP had modeled, and therefore, that the securitization structures and their credit ratings were now invalid. For a BBB tranche that had garnered its credit rating on the basis of a low expected loss, it was now given that expected losses would clearly be much higher. When this tranche possessed a much higher risk, it was no longer a BBB risk, and should have possessed a much lower credit rating.

94. The stall tactics utilized by CITIGROUP and the individual defendants when plaintiffs requested a bid was in response to CITIGROUP's knowing attempt to conceal its scheme. Even in a separate action filed in the Southern District of New York, an unnamed Vice President in charge of Product Control for Fixed Income Operating in CITIGROUP's Global Equity Derivatives Group alleges that:

> [it is] confirmed that there were no written procedures for pricing derivatives and no scientific method was being applied to pricing of CDOs. Indeed [that vice president] stated that "traders were just throwing out numbers and the [CDO] values were overinflated leaving [that VP] with a "big cleanup job."

In re Citigroup Inc. Securities Litigation, Master File No.: 07 Civ. 990 1 (SHS), See Complaint at 445.

95. Even given BRODY's years of experience and his analysis of the offering, it would not have been possible to discover defendants' misrepresentations and omissions, because they were deliberately concealed. BRODY justifiably relied upon the extensive expertise, and representations made by defendants. Indeed, defendants who were already a behemoth in the CDO industry, solicited BRODY to purchase OCTONION in an industry riddled with problems that it helped perpetuate, all the while, leaving those risks undisclosed to investors like plaintiffs.

* * * * * * * * * * * * * * * * *

96.   The following demonstrates and further lends support to plaintiffs' characterization of the true nature of CITIGROUP's CDO underwriting enterprise and Ponzi-like scheme.

97.   Upon information and belief, which can only be confirmed after discovery, in early 2007, CITIGROUP provided a $200 million line of credit to an entity called Everquest Financial which was set up by Bear Stearns Asset Management. Bear Stearns Asset Management was the only other investor in OCTONION's equity tranche.

98.   As a part of their underhanded practice, CITIGROUP received a 4% equity stake in Everquest.   To assist in off-loading toxic assets from CITIGROUP's books, Everquest used this line of credit to purchase toxic assets from the Bear Stearns Asset Management Funds and CITIGROUP. As a further example of the depths of deception that CITIGROUP was prepared to descend, CITIGROUP's ultimate intention was to take Everquest public though an Initial Public Offering, part of which process would be used to reimburse CITIGROUP for its hidden losses.

99.   Outrageously, the assets that Everquest was comprised of included $24,000,000.00 of OCTONION's equity tranche. This amount was half of the entire portfolio representing OCTONION's equity tranche, which was transferred to a new hiding spot in Everquest. That the entire three million dollars of plaintiffs' investment with CITIGROUP was comprised of OCTONION's equity

tranche, clearly highlights CITIGROUP's fraudulent scheme and the direct impact these acts had upon plaintiffs.

100. CITIGROUP and Bear Stearns Asset Management Funds were simply dumping waste. In June of 2007, Bear Stearns Asset Management Funds became the first public CDO-related meltdown, resulting in a 100% loss for those investors. By dumping OCTONION into Everquest as toxic waste, CITIGROUP revealed that rather than engaging in an arms-length transaction when valuating OCTONION to plaintiffs, it preferred to trap plaintiffs within their scheme. Furthermore, given CITIGROUP's equity stake in Everquest, an additional incentive for CITIGROUP to inflate OCTONION's marks is evidenced.

## CITIGROUP UNDERWROTE CDOS WHILE LEAVING RISK MANAGEMENT BEHIND

101. The structural organization of risk management at CITIGROUP did not promote independence between risk management and trading. CITIGROUP kept the marks artificially high despite the fact that senior managers such as MAHERAS, BARKER, BUSHNELL, QUINTIN, DOMINGUEZ, and RAYNES were supposed to keep an eye on the CITIGROUP's bond trading business and its multi-billion dollar portfolio of mortgage-backed securities—activities.

102. The lax guidelines in the world that gave birth to deals such as OCTONION, was an ideal breeding ground for CITIGROUP's Ponzi-like scheme. The inflated market generated

more underwriting deals, which in turn, lined the pockets of CITIGROUP and its leaders.

103. Upon information and belief, in 2008, QUINTIN boasted to interviewers at Merrill Lynch (who subsequently hired him) that as head of CDO Trading he had made $300,000,000.00 for CITIGROUP in 2007. The pernicious self-dealing is evident. Given the reality that the CDO market was truly worthless, those revenues do not follow unless CITIGROUP engaged in the practice of simultaneously short-selling the bonds in OCTONION, while selling the OCTONION package to outsiders like plaintiffs. The easiest outlet for CITIGROUP to perpetuate this scheme would be to short through CITIGROUP's own CDO machine. Plaintiffs contend that this is exactly what occurred.

104. As for the managers, BUSHNELL who was the bank's Senior Risk Officer for bond trading, with help from his staff, was supposed to regulate BARKER's fixed income trading desk. Instead BUSHNELL was under the effective command of BARKER. Citigroup insiders reported that BARKER could push approvals through and over risk management at the expense of CITIGROUP's long term interests. The New York Times ran a story saying:

> Because Mr. Bushnell had to monitor traders working for Mr. Barker's bond desk, their friendship raised eyebrows inside the company among those concerned about its controls.

After all, traders' livelihoods depended on finding new ways to make money, sometimes using methods that might not be in the bank's long-term interests. But insufficient boundaries were established in the bank's fixed income unit to limit potential conflicts of interest involving Mr. Bushnell and Mr. Barker, people inside the bank say.

Indeed, some at Citigroup say that if traders or bankers wanted to complete a potentially profitable deal, they could sometime rely on Mr. Barker to convince Mr. Bushnell that is as a risk worth taking.

Risk Management "has to be independent, and it wasn't independent at Citigroup, at least when it came to fixed income," said one former executive in Mr. Barker's group who, like many other people interviewed for this article insisted on anonymity because of pending litigation against the bank or to retain close ties to their colleagues. "We used to say that if we wanted to get a deal done, we needed to convince Randy first because he could get it through."

Others say that Mr. Bushnell's friendship with Mr. Maheras may have presented a similar blind spot.

"Because he has such trust and faith in these guys he has worked with for years, he doesn't ask the right questions," a former senior Citigroup executive said, referring to Mr. Bushnell.[5]

105. The New York Times further reported on CITIGROUP's internal conflicts of interest, citing the fact that risk managers in the fixed-income division lacked clear partitions when reporting potential risks:

---

[5] "Citigroup Pays for a Rush to Risk", by Eric Dash and Julie Creswell, New York Times, November 23, 2008, at page 34.

> Yet as the bank's C.D.O. machine
> accelerated, its risk controls fell further
> behind, according to former Citigroup
> traders, and risk managers lacked clear
> lines of reporting. At one point, for
> instance, risk managers in the fixed income
> division reported to both Mr. Maheras and
> Mr. Bushnell...[6]

106. MAHERAS led CITIGROUP's trading division. BUSHNELL was responsible for managing risk. BUSHNELL's risk managers reported not only to BUSHNELL, but to MAHERAS as well. This dual reporting effectively gave MAHERAS direct influence over the very employees who were supposed to be managing trading risk, and reveals CITIGROUP's conflicted management style.

107. Upon information and belief, when CITIGROUP employees, such as Mark Tsezarsky and Jeff Perlowitz, expressed concern to management, such as BARKER, as to the risks being taken in CITIGROUP's CDO business, they were told in sum and substance and in no uncertain terms laced with profanity, to shut up.

108. CITIGROUP was able to underwrite CDO deals with no concern for its underwriting guidelines or protection from default, because it never intended to hold on to the debt. Risk managers weren't worried about pitfalls when the goal was to make money without concern for the fall-out. Risk Managers at CITIGROUP assumed their shoddy underwriting practices, packaged loans into their ever increasing CDO machine, generated huge

---

[6] ibid.

fees while hiding worthless assets in new securitization vehicles, and in hindsight are partly responsible for the worst economic disaster in recent history.

109. Based on the foregoing, it is evident that, in an attempt to defraud its investors in obtaining their money and dumping their toxic assets, CITIGROUP and the individual defendants, engaged in a pattern and practice of misrepresenting and providing misleading information to plaintiffs herein. This deception and behavior was perverse, rampant, and widespread.

## FIRST CAUSE OF ACTION

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER (AGAINST ALL DEFENDANTS)

110. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

111. This Count is brought by plaintiffs to enforce liabilities imposed on defendants by Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 of the SEC.

112. The defendants throughout the period complained of herein intentionally and knowingly concealed material information concerning the true value of the security and its composition.

113. Plaintiffs allege that, defendants engaged in an unlawful combination and conspiracy, pursuant to which defendants engaged in acts, transactions, practices, and courses

of business that operated and are operating as a fraud and deceit on plaintiffs.

114. Defendants made various untrue statements of material fact and omitted to state other material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiffs, all in violation of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated under the Securities Exchange Act. As more fully set forth below, the purpose and effect of which was to cause plaintiffs to purchase OCTONION for excessive consideration.

115. The false representations and failure to disclose the truth of that which is alleged herein, had the effect of causing OCTONION to be offered and sold at artificially inflated prices during the period of time alleged herein.

116. Plaintiffs relied upon and were misled to their loss and detriment in purchasing OCTONION. In connection with and prior to the offer, sale, and delivery alleged in this complaint, individual defendants knowingly and willfully employed devices, schemes, and artifices to defraud and hide the true value of OCTONION. Furthermore, individual defendants made untrue, deceptive, and misleading statements of material fact. In addition, individual defendants omitted to state material facts that were essential, in light of the circumstances, in

order not to mislead plaintiffs, and engaged in acts, practices, and courses of business that operated as a fraud and deceit on plaintiffs.

117. In connection with the above offer, sale, and delivery of the security, individual defendants made use of the United States mail, interstate telephones, and the means and facilities of interstate commerce.

118. Individual defendants all participated in, aided, abetted, approved, or either knew of or had reasonable grounds to know of all facts set forth in this complaint, and failed to prohibit the transactions between CITIGROUP, HARDING and plaintiffs. Furthermore, at all times pertinent, individual defendants were the employees and/or agents of CITIGROUP, and at all times were acting within the course, scope, and purpose of their employment.

119. The deceptive acts and devices utilized by defendants in order to effectuate the above-mentioned conspiracy consisted of the following false representations by defendants, which is contained in: oral statements and among other documents; the marketing materials; promotional research; the offering circular; the subscription documents; the repurchase agreement; and various emails, all of which were prepared by defendant CITIGROUP with the participation, acquiescence, encouragement,

cooperation or assistance of HARDING and the other individual defendants:

a) Notwithstanding assertions and representations to the contrary, the collateral assets underlying OCTONION were low-quality and impaired;

b) The due diligence and monitoring of OCTONION's collateral assets were inadequate;

c) CITIGROUP's loss projection and default models used to valuate OCTONION were unreliable and wrong;

d) CITIGROUP and/or HARDING's obligation to fund OCTONION was satisfied with largely worthless assets left over from prior securitizations in CITIGROUP's warehouse. Further, that the obligation to fund OCTONION would meet the same reasonable standard of due diligence and proper vetting delineated in the offering materials;

e) CITIGROUP fraudulently represented that it would take all necessary and appropriate steps to provide a legitimate mark and bid for the bonds so plaintiffs could manage investments on behalf of its investors;

f) CITIGROUP provided false and inflated marks when it was obligated to provide a fair value in evaluating OCTONION;

g) CITIGROUP would repurchase OCTONION at plaintiffs' request; and

h)   CITIGROUP used stall tactics and failed to provide a necessary bid consistent with a legitimate mark to plaintiffs; and

i)   CITIGROUP intentionally ignored and did not protect against the numerous conflicts of interest resulting from the lack of risk oversight from CITIGROUP's management.

120. CITIGROUP continued to generate underwriting fees, while in fact, as was well known to the individual defendants, CITIGROUP was losing substantial sums of money and trying to cover it up by dumping their leftovers into OCTONION;

121. The above-mentioned misrepresentations of material facts and omissions were part of a deliberate scheme and conspiracy between individual defendants to seek to conceal the nature of OCTONION by selling this security to plaintiffs without revealing to them its true value.

122. Plaintiffs did not discover, and could not have discovered by the exercise of reasonable diligence, the true facts that were wrongfully misrepresented, concealed, and omitted until long after the security was purchased by and delivered to plaintiff.

123. Had individual defendants not made the above-mentioned fraudulent misrepresentations and omissions, plaintiff would never have purchased the security. Plaintiff paid three million ($3,000,000.00) dollars for the security. The security was, at

all times pertinent to this complaint, substantially worthless, and certainly not the value that plaintiffs paid.

124. As a direct and proximate cause of defendants' wrongful conduct, plaintiffs have been actually damaged in the amount of two-million eight-hundred eighty thousand ($2,880,000.00) dollars, plus the amount by which the security would have increased in value had individual defendants' false representations concerning the security been true, together with income lost on the three-million ($3,000,000.00) dollars paid for OCTONION.

### SECOND CAUSE OF ACTION

#### VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
#### (AGAINST THE INDIVIDUAL DEFENDANTS EMPLOYED BY CITIGROUP)

125. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

126. As alleged herein, each of the individual defendants acted as controlling persons in and of CITIGROUP within the meaning of Section 20(a) of the Exchange Act, (15 U.S.C. §78t(a)). By virtue of their positions, as alleged above, these individuals had the power to influence and control and did influence and control, directly or indirectly, the decision-making of CITIGROUP. This included the content and dissemination of the various statements which plaintiffs contend are false and misleading. The individual defendants were

provided with or had unlimited access to copies of CITIGROUP's internal reports, marketing materials, offering documents, and other statements and materials alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

127. In particular, the individual defendants employed by CITIGROUP had direct involvement in the day-to-day operations of CITIGROUP and control over HARDING's decision-making through CHAU, and therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.

128. As set forth above, the individual defendants and CITIGROUP committed a primary violation of Section 10(b) and Rule 10b-5 by the acts and omissions alleged in this Complaint. By virtue of their positions as controlling persons of Citigroup, the individual defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the individual defendants' wrongful conduct, plaintiffs suffered actual damages in the amount of two-million eight-hundred eighty thousand ($2,880,000.00) dollars.

## THIRD CAUSE OF ACTION

### FRAUD
### (AGAINST ALL DEFENDANTS)

129. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

130. CITIGROUP participated in a systematic scheme to defraud plaintiffs through the underwriting and ultimate sale of OCTONION through the following conduct:

a)   Notwithstanding assertions and representations to the contrary, the collateral assets underlying OCTONION were low-quality and impaired;

b)   The due diligence and monitoring of OCTONION's collateral assets were inadequate;

c)   CITIGROUP's loss projection and default models used to valuate OCTONION were unreliable and wrong;

d)   CITIGROUP and/or HARDING's obligation to fund OCTONION was satisfied with largely worthless assets left over from prior securitizations in CITIGROUP's warehouse.   Further, that the obligation to fund OCTONION would meet the same reasonable standard of due diligence and proper vetting delineated in the offering materials;

e)   CITIGROUP fraudulently represented that it would take all necessary and appropriate steps to provide a legitimate mark and bid for the bonds so plaintiffs could manage investments on behalf of its investors;

f)   CITIGROUP provided false and inflated marks when it was obligated to provide a fair value in evaluating OCTONION;

g)   CITIGROUP would repurchase OCTONION at plaintiffs' request; and

h)   CITIGROUP used stall tactics and failed to provide a necessary bid consistent with a legitimate mark to plaintiffs; and

i)   CITIGROUP intentionally ignored and did not protect against the numerous conflicts of interest resulting from the lack of risk oversight from CITIGROUP's management.

131. At the times the various representations by defendants were made, CITIGROUP, their officers and agents, and those acting on their behalf, had no intention of fulfilling their promises, and knew them to be false.

132. CITIGROUP failed to adhere to all of the aforementioned representations. They were made to induce plaintiffs to purchase OCTONION, and then prevent plaintiffs from selling OCTONION. CITIGROUP was further motivated not to abide by their aforementioned representations in order to keep the toxic assets off of their balance sheet, thereby passing the loss onto plaintiffs.

133. As a direct and proximate result of CITIGROUP's knowing misrepresentations and omissions, plaintiffs have suffered monetary damages, and BRODY has suffered harm to his professional reputation.

134. CITIGROUP, HARDING, and the individual defendants' conduct, was willful and malicious.

135. As a direct and proximate result of defendants' fraud, plaintiffs have been actually damaged in the amount of two-million eight-hundred eighty thousand ($2,880,000.00) dollars, plus the amount by which the security would have increased in value had individual defendants' false representations concerning the security been true, together with income lost on the three-million ($3,000,000.00) dollars paid for OCTONION.

## FOURTH CAUSE OF ACTION

### FRAUDULENT INDUCEMENT
### (AGAINST ALL DEFENDANTS)

136. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

137. Reassured by his decade of dealing with CITIGROUP, their officers, agents, and those acting on their behalf, BRODY relied on the foregoing representations by, investing three million ($3,000,000.00) dollars in OCTONION, a CITIGROUP-sponsored securitization package, rather than other investments.

138. Defendants represented to plaintiffs that (a) OCTONION consisted of legitimately-valued assets; (b) plaintiffs relied upon defendants' representations when purchasing OCTONION; and (c) this information was materially false and conveyed with the specific intent to induce plaintiffs to invest.

139. All of the representations by defendants were false when made and defendants knew them to be false. In particular, CITIGROUP, HARDING, and the individual defendants knew, or reasonably should have known, that they were packaging and securitizing assets with inaccurate and inflated values, which were concealed in the OCTONION offering.

140. By reason of the foregoing, Plaintiffs have been actually damaged in an amount of two-million eight-hundred eighty thousand ($2,880,000.00) dollars.

## FIFTH CAUSE OF ACTION

### BREACH OF CONTRACT
(AGAINST CITIGROUP AND ALL INDIVIDUAL DEFENDANTS EMPLOYED BY CITIGROUP)

141. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

142. In or about February of 2007, plaintiffs and CITIGROUP entered into a contract pursuant to which plaintiffs purchased and CITIGROUP sold OCTONION. It was a material term of that contract that the representations made by CITIGROUP, its salesmen and agents, and set forth in writing in the OCTONION offering materials, were true and accurate, and that all material information had been disclosed to plaintiffs. CITIGROUP breached its contract with plaintiffs, and breached its implied covenant of good faith and fair dealing in connection with that contract, because the representations made in connection with

the sale of OCTONION were false and CITIGROUP failed to disclose material information to plaintiffs, including without limitation the following:

a)   that   the   collateral   underlying   OCTONION   was   low-quality and impaired;

b)   that the due diligence and monitoring of the OCTONION collateral was inadequate;

c)   CITIGROUP's loss projection and default models used to valuate OCTONION were unreliable and wrong;

d)   that   CITIGROUP   provided   false   marks   when   it   was obligated to provide an accurate valuation of OCTONION;

f)   that  a  portion  of  OCTONION  was  funded  with  largely worthless  assets  left-over  in  CITIGROUP's  warehouse  sometime after plaintiffs purchased OCTONION;

g)   that CITIGROUP violated their contract with plaintiffs when  agreeing  to  value  OCTONION  for  plaintiffs  so  that  they could effectively manage and control the investment; and

h)   that   CITIGROUP   used   stall   tactics   and   ultimately failed to provide a bid to plaintiffs that was consistent with a legitimate mark.

143. CITIGROUP failed in all of its contractual obligations owed to Plaintiff.

144. Defendants have substantially and materially breached the contract in and for the sale of OCTONION as described herein.

145. By reason of the foregoing, Plaintiffs have been actually damaged in an amount of two-million eight-hundred eighty thousand ($2,880,000.00) dollars.

<u>SIXTH CAUSE OF ACTION</u>

Tortious Interference with Contract
(AGAINST HARDING AND CHAU)

146. Plaintiffs repeat and re-alleges each and every allegation contained above as if fully set forth herein.

147. A valid agreement existed between Plaintiffs and CITIGROUP.

148. HARDING and CHAU were aware that a valid agreement existed between Plaintiffs and CITIGROUP.

149. HARDING, as manager of OCTONION, and CHAU as HARDING's President, assisted CITIGROUP and the individual defendants employed by CITIGOUP, in scheming to defraud plaintiffs. HARDING and CHAU agreed to accept and fund OCTONION with CITIGROUP's own substantially worthless leftovers, which were repackaged into OCTONION for concealment.

150. By the acts described herein, which were spurred by CITIGROUP's desire to conceal the true nature of their toxic assets, and to off-load them onto others, including plaintiffs,

HARDING and CHAU intentionally interfered with CITIGROUP's obligation to plaintiffs by acquiescing to CITIGROUP.

151. HARDING and CHAU's conduct was willful, malicious, and without any justification.

152. As a direct and proximate result of HARDING and CHAU's aforesaid tortious interference with plaintiffs' contract with CITIGROUP, plaintiffs actually damaged in the amount of two-million eight-hundred eighty thousand ($2,880,000.00) dollars.

### SEVENTH CAUSE OF ACTION

#### UNJUST ENRICHMENT
(AGAINST ALL DEFENDANTS)

153. Plaintiffs repeat and re-alleges each and every allegation contained above as if fully set forth herein.

154. As a result of their fraud and other wrongful conduct, defendants have been unjustly enriched. It would be inequitable and unjust to permit defendants to retain the proceeds of their unlawful conduct.

155. Plaintiffs are entitled to judgment directing defendants to disgorge all amounts received as a result of their fraudulent and wrongful conduct in connection with OCTONION, managed by HARDING and sold by CITIGROUP, including without limitation: the proceeds of the sales of OCTONION, all collateral management fees, trustee fees, collateral administration fees, distributions of any type from OCTONION,

commissions or sales fees, and amounts received from OCTONION in transactions involving the purchase of collateral.

## EIGHTH CAUSE OF ACTION

### NEW YORK GENERAL BUSINESS LAW § 350
### (AGAINST CITIGROUP AND HARDING)

156. Plaintiffs repeat and re-alleges each and every allegation contained above as if fully set forth herein.

157. The OCTONION offering materials constituted "advertising" under General Business Law § 350. The OCTONION marketing book and Offering Circular were prepared and used to solicit investors by defendants. As discussed above, those materials were materially misleading.

158. The conduct of CITIGROUP and HARDING in issuing the OCTONION marketing book and Offering Circular violated General Business Law § 350.

159. CITIGROUP is liable to plaintiffs for their actual damages in the amount of two-million eight-hundred eighty thousand ($2,880,000.00) dollars caused by their unlawful and false advertising.

160. The conduct of CITIGROUP and HARDING in violating General Business Law § 350 was intentional, willful, and malicious.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

WHEREFORE, Plaintiffs respectfully request Judgment as follows:

A) Awarding compensatory damages to plaintiffs for actual damages suffered, in an amount to be determined at trial but not less than two-million eight-hundred eighty thousand ($2,880,000.00) dollars, as against all defendants jointly and severally;

B) Awarding punitive damages to plaintiffs because defendants' conduct was manipulative, willful, wanton and malicious and aimed at plaintiffs, in an amount to be determined at trial, but not less than twenty-five million nine-hundred twenty thousand ($25,920,000.00) dollars.

C) Awarding plaintiffs interest, costs and reasonable attorneys fees; and

D) Granting such further, other, and different relief, as the Court deems just and proper.

DATED:     March 19, 2009
           New York, New York          LIEBERMAN BRODY LLP
                                        Attorneys for Plaintiffs
                                        1370 Avenue of the Americas
                                        20th Floor
                                        New York, New York 10019
                                        Email: lara@liebermanbrody.com
                                        Tel.:  212.956.7222
                                        Fax:   212.956.7225


                                  By:  LARA J. BRODY  (LB7858)

## CORPORATE VERIFICATION

STATE OF NEW YORK     )
COUNTY OF NEW YORK    )ss.:

    I, ALAN BRODY, having duly affirmed, depose and say: I am the Managing Member of EPIRUS CAPITAL MANAGEMENT LLC and a party in the within action; I have read the foregoing COMPLAINT and know the contents thereof; the same is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe it to be true.   This verification is made by me because the above party is a corporation and I am an officer thereof.

    The grounds of my belief as to all matter not stated upon my own knowledge are as follows: Books and records maintained by the corporation in the regular course of its business.

                    EPIRUS CAPITAL MANAGEMENT LLC

                    By: ALAN BRODY

Affirmed to before me this
19th day of March, 2009.

LARA J. BRODY
NOTARY PUBLIC, STATE OF NEW YORK
NO. 02BR6102337
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXPIRES 12/1/2011

## CORPORATE VERIFICATION

STATE OF NEW YORK    )
COUNTY OF NEW YORK   )ss.:

    I, ALAN BRODY, having duly affirmed, depose and say: I am the Managing Member of DODONA I, LLC and a party in the within action; I have read the foregoing COMPLAINT and know the contents thereof; the same is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe it to be true. This verification is made by me because the above party is a corporation and I am an officer thereof.

    The grounds of my belief as to all matter not stated upon my own knowledge are as follows: Books and records maintained by the corporation in the regular course of its business.

DODONA I, LLC

By: ALAN BRODY

Affirmed to before me this
19th day of March, 2009.

LARA J. BRODY
NOTARY PUBLIC, STATE OF NEW YORK
NO. 02BR6102337
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXPIRES 12/1/2011

## INDIVIDUAL VERIFICATION

STATE OF NEW YORK    )
COUNTY OF NEW YORK   ) ss.:


    I, ALAN BRODY, having duly affirmed, depose and say: I am the plaintiff in the within action; I have read the foregoing COMPLAINT and know the contents thereof; the same is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe it to be true.

                                                               **ALAN BRODY**

Affirmed to before me this
19th day of March, 2009.

LARA J. BRODY
NOTARY PUBLIC, STATE OF NEW YORK
NO. 02BR6102337
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXPIRES 12/1/2011

LIEBERMAN BRODY LLP


I.A.S. JUSTICE:
R.J.I. NO.:

INDEX NO.:
CALENDAR NO.:


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
============================================================

EPIRUS CAPITAL MANAGEMENT, LLC, DODONA
I, LLC, and ALAN BRODY,

                                        PLAINTIFFS,


         -against-

CITIGROUP    INC.,    CITIGROUP    GLOBAL
MARKETS  INC.,  OCTONION  I  CDO  CORP.,
HARDING ADVISORY LLC, WING CHAU, THOMAS
MAHERAS,    RANDOLPH   BARKER,   MICHAEL
RAYNES,    DONALD    QUINTIN,    NESTOR
DOMINGUEZ,  JOHN  FRONTERO,  and  DAVID
BUSHNELL,

                                        DEFENDANTS.


============================================================

VERIFIED COMPLAINT

============================================================

LIEBERMAN BRODY LLP
OFFICE & P.O. ADDRESS, TELEPHONE
1370 AVENUE OF THE AMERICAS, 20TH FLOOR
NEW YORK, NEW YORK 10019
TEL: (212) 956.7222