UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                                    :
EPIRUS CAPITAL MANAGEMENT, LLC,                     :
DODONA I, LLC, and ALAN BRODY,                      :
                                                    :       09 Civ. 2594 (SHS)
                                                    :
                            Plaintiffs,             :       OPINION
                                                    :
            -against-                               :
                                                    :
CITIGROUP INC., CITIGROUP GLOBAL                    :
MARKETS INC., OCTONION I CDO CORP.,                 :
HARDING ADVISORY LLC, WING CHAU,                    :
THOMAS MAHERAS, RANDOLPH BARKER                     :
MICHEAL RAYNES, DONALD QUINTIN,                     :
NESTOR DOMINGUEZ, JOHN FRONTERO, and                :
DAVID BUSHNELL                                      :
                                                    :
                            Defendants,             :
------------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

**I. BACKGROUND**

Plaintiffs Epirus Capital Management, LLC, Dodona I LLC, and Alan Brody bring this action alleging that Citigroup, Citigroup Global Markets Inc. (collectively "Citigroup Defendants"), Randolph Barker, David Bushnell, Nestor Dominguez, John Frontero, Thomas Maheras, Donald Quintin, Michael Raynes, Harding Advisory LLC, and Wing Chau engaged in a scheme to defraud plaintiffs by making omissions and misrepresentations of material fact in connection with the sale of securities of Octonion I CDO Corp. to plaintiffs.[1]  Defendants deny the existence of any such scheme and contend that plaintiffs have not pled any of the elements required to succeed on their claims.  Because plaintiffs have not alleged adequately any false statements or omissions and have not established the strong inference of scienter required to state a claim for relief pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated pursuant to that statute, defendants' motions to dismiss are granted.

---

[1] Plaintiffs have dismissed Octonion I CDO Corp. from this action voluntarily.

A. Facts

The following facts are taken from the complaint and are presumed to be true for the purposes of this motion.

### *1. Parties*

Plaintiff Alan Brody is a sophisticated investor who has substantial expertise in asset-backed securities. Brody formed Epirus Capital Management, LLC and Dodona I, LLC for the purpose of investing in collateralized debt obligations ("CDOs"). (Compl. ¶ 22.)

Defendant Citigroup Inc. is a holding company that, through its subsidiaries, provides a range of global diversified financial services. Citigroup Global Markets Inc. ("CGMI") is the broker-dealer subsidiary of Citigroup Inc., and it structured and invested in collateralized debt obligations in 2007.

Plaintiffs allege that defendants Randolph Barker, David Bushnell, Nestor Dominguez, John Frontero, Thomas Maheras, Donald Quintin, and Michael Raynes were all either senior salesmen or senior managers at Citigroup or CGMI. (*Id.* ¶ 31.) Defendant Harding Advisory, LLC ("Harding") is an entity which was employed to evaluate the assets used to fund Octonion; defendant Chau served as Harding's president during the relevant time period. Plaintiffs allege that Chau was ultimately responsible for selection of the assets in Octonion, and rather than being diligent in fulfilling this obligation, Chau failed to act independently of the Citigroup Defendants' interests. Plaintiffs allege that by placing unsellable assets from other Citigroup-sponsored CDOs into Octonion, Harding and Chau assisted Citigroup in "off-loading its junk onto plaintiffs' balance sheet." (*Id.* ¶ 32.)

### *2. CDOs*

According to the complaint, a collateralized debt obligation is an asset-backed security constructed from a portfolio of fixed-income assets such as residential mortgage backed securities ("RMBS"). (*Id.* ¶ 37.) The rights to the cash flow from the CDO assets are divided into a number of classes, or tranches, whereby the senior tranches receive payment before the junior tranches, and the junior tranches protect the senior tranches from losses on the underlying portfolio. (*Id.*) To compensate for the greater risk, the junior tranches offer higher interest rates. (*Id.*) The equity tranche is the lowest

tranche in the structure and typically includes a high interest rate plus the right to receive the residual value in the CDO.  (*Id.* ¶¶ 39, 91.)  As the most junior tranche, the equity tranche bears the highest risk because it is the first to suffer losses if the CDO assets decline in value, but it also has the highest potential returns.  (*Id.* ¶¶ 39, 86, 91.)

### 3. *Octonion*

In early 2007, plaintiffs invested in a CDO called Octonion I, which was structured by CGMI.  Plaintiffs purchased a portion of the equity tranche in Octonion—the riskiest portion of the CDO—at a twenty-five percent discount.  The equity tranche that plaintiffs invested in is referred to as "Income Notes."  (*Id.* ¶ 47.)

Harding served as the CDO manager for Octonion.  (*Id.* ¶¶ 39, 59.)  As CDO manager, Harding oversaw the selection and monitoring of the collateral underlying Octonion.  (*Id*. ¶¶ 8, 32.)  Octonion was structured to include approximately $1 billion of assets—primarily tranches of subprime and midprime RMBS as well as other CDOs.  (*Id.* ¶¶ 51, 69.)  As is common in CDO transactions, Harding acquired additional assets for Octonion following the closing of the transaction in order to reach the target level of assets, including approximately $34 million of CDO securities from previous CGMI CDO securitizations.  (*Id*. ¶ 51.)

Octonion was described in the Marketing Book as a "CDO transaction that is able to invest in RMBS, ABS [asset-backed securities], and CDO securities" with a target allocation that would include CDO securities as seven and one half percent of the underlying assets.  (Ex. 2 to Karen King Declaration ("King Decl.") at 1, 4.)  The Marketing Book warned investors that "[a]n investment in the Income Notes is speculative, not suitable for all clients, and intended for experienced and sophisticated investors."  (*Id.* at A.)

The Marketing Book summarized in its preamble the key risk factors and then referred potential investors to a nine-page section explaining the risks involved in investing in the Octonion equity tranche, which included among other factors that:

3

> [t]here is no market for the Income Notes being offered hereby and as a result, a purchaser must be prepared to hold the Income Notes for an indefinite period of time or until the redemption thereof[.] Citigroup and its affiliates will not be obligated to make a market in the Income Notes[.] The Income Notes are expected to be owned by a relatively small number of investors, and no assurance can be given that any secondary market for the Income Notes will develop, and it may be difficult for holders of the Income Notes to determine the value of the Income Notes at any particular time[.] Purchasers of the Income Notes may find it difficult or uneconomic to liquidate their investment at a particular time[.]

(*Id.* at 32.)

Plaintiffs allege that each of the defendants made omissions or misrepresentations of material fact in connection with plaintiffs' purchase in the following areas: First, the Offering Circular failed to disclose the true nature of the collateral from Citigroup's warehouse that ultimately wound up in Octonion after the closing date and before the "Ramp-Up" period concluded. The Ramp Up period is the period of time that defendants had to complete the funding for Octonion after the deal had closed on March 6, 2007. Second, the selection procedure for assets indicated in Harding's marketing materials, dated January 2007, which were incorporated by reference into the Offering Circular, was materially different than the procedure actually employed by defendants in selecting assets during the Ramp Up period for inclusion in Octonion.[2] (*Id.* ¶¶ 51-53.) These misstatements and omissions occurred between January and November 2007. (*Id*. ¶ 22.)

Plaintiffs concede in their memorandum of law that "a disclosure was made in the Offering Circular indicating that assets could be chosen from a warehouse facility." (Pls.' Mem. of Law at 2.) Plaintiffs allege, however, that defendants failed to disclose that Citigroup's warehouse was a repository of defendants' unsold "detritus." (*Id.*) Plaintiffs contend that these assets were devoid of and incapable of being assessed for an accurate fair market value because defendants were exposed to billions of

---

[2] The allegedly worthless recycled assets that were added to Octonion after the close of the transaction but during the Ramp Up period included:

1. $10 million of Adam Squared 2007-2A class C;
2. $10 million of Class V Funding 2007-3A class C;
3. $10 million of 888 Tactical Fund 2007-1A class C;
4. $3,724,626.13 of TopG2005-1A class C

Each of these CDOs were previously owned and underwritten by Citigroup. (Compl. ¶ 51-53.)

4

dollars of write downs that they eventually were forced to declare. In addition, plaintiffs allege that these assets were added after the deal was closed, but prior to the end of the Ramp Up period in an effort to avoid detection by plaintiffs.

The basis of plaintiffs' second claim is that Harding and Chau's investment choices were inappropriate because they included too many overpriced Citigroup warehouse CDOs that were unsold in prior Citigroup securitizations. Plaintiffs contend that certain statements made by Harding regarding its general investment objectives and approaches were materially false or misleading. The allegedly false and misleading statements in Harding's Investment Objectives included, *inter alia*, that Harding would: (1) "Invest in high quality assets with stable returns and superior capital preservation profiles"; and (2) "Maximize returns and minimize losses through rigorous upfront credit and structural analysis, as well as ongoing monitoring of asset quality and performance." (Compl. ¶ 49.) Plaintiffs also contend that Harding's Approach to Investing, which stated that Harding "employ[ed] a top/down economic analysis to determine sector allocation," was materially misleading. (*Id.*)

### 4. *The Complaint*

The complaint asserts eight causes of action: (1) violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, against all defendants (*id.* ¶¶ 110-24); (2) violation of Section 20(a) of the Exchange Act against all individual defendants (*id.* ¶¶ 125-28); (3) fraud, against all defendants (*id.* ¶¶ 129-35); (4) fraudulent inducement, against all defendants (*id.* ¶¶ 136-40); (5) breach of contract against the Citigroup Defendants (*id.* ¶¶ 141-45) (6) tortious interference with contract against Harding Advisory LLC and Wing Chau (*id.* ¶¶ 146-52); (7) unjust enrichment, against all defendants (*id.* ¶¶ 153-55); and (8) violation of New York General Business Law § 350, against Citigroup and Harding Advisory LLC (*id.* ¶¶ 156-60). Plaintiffs have voluntarily withdrawn claims (5) and (8)—the contract claim and the New York General Business Law claim. (*See* Pls.' Mem. of Law at 22.)

## II. LEGAL STANDARD

### A. Motion to Dismiss Standard

In evaluating a motion to dismiss a complaint pursuant to Rule 12(b)(6), a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 154 (2d Cir. 2006); *S.E.C. v. Lyon*, 529 F. Supp. 2d 444, 449 (S.D.N.Y. 2007). A court's "consideration [on a motion to dismiss] is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *McKenzie v. Gibson*, No. 07 Civ. 6714, 2008 U.S. Dist. LEXIS 64850, at *4-5 (S.D.N.Y. Aug. 25, 2008) (quoting *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)).

A complaint should be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, --U.S.--, 129 S.Ct. 1937, 1950 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556).

A complaint alleging securities fraud is subject to two heightened pleading standards. First, the complaint must satisfy Rule 9(b), which requires that "the circumstances constituting fraud . . . be stated with particularity." Fed. R. Civ. P. 9(b); *see also* <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 99 (2d Cir. 2007). Second, the complaint must meet the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b).

B. <u>Section 10(b) Claims</u>

"To state a claim under § 10(b) of the Securities Exchange Act or Rule 10b-5, a plaintiff must plead that the defendant (1) made a false material representation or omitted a material fact, (2) with scienter, and (3) that the plaintiff's reliance on defendant's action caused plaintiff injury." *Starr v. Georgeson Shareholder, Inc.*, 412 F.3d 103, 109 (2d Cir. 2005).

Pursuant to the PSLRA and Fed. R. Civ. P. 9(b), "plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Tellabs v. Makor*, 551 U.S. 308, 314 (2007) (quoting 15 U.S.C. § 78u-4(b)(2)). That state of mind requires "'intent

6

to deceive, manipulate, or defraud.'" *Id.* at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)). To survive a motion to dismiss, a complaint must plead a strong inference of scienter by alleging with particularity either (a) "facts to show that defendants had both motive and opportunity to commit fraud" or (b) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138-39 (2d Cir. 2001).

To allege a "motive and opportunity" to defraud, a complaint must allege facts showing that the defendants "benefited in some concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000). "Motives that are common to most corporate officers . . . do not constitute motive for purposes of this inquiry." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

Strong circumstantial evidence of reckless conduct also gives rise to an inference of scienter, as long as the complaint alleges "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit*, 264 F.3d at 142 (quotation and citation omitted). "'Securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.'" *Id.* (quoting *Novak*, 216 F.3d at 308). However, "[t]o qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. In making this determination, the Court must assess "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323 (emphasis in original).

In addition, for a plaintiff to succeed in pleading scienter with respect to a corporation without doing so for any individual, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

7

**III. DISCUSSION**

    A.  <u>Section 10(b) and Rule 10(b)-5 Claims</u>

Plaintiffs allege that because defendants disclosed that collateral could be chosen from the Citigroup warehouse, they created the impression that assets would be selected with the same level of diligence used in selecting the assets that were chosen and known to plaintiffs before the transaction's closing date. Plaintiffs contend that defendants had a duty to disclose the true nature of the warehouse assets—*i.e.*, allegedly that the Citigroup warehouse assets were worthless. Plaintiffs maintain defendants knew that the assets of Octonion were substantially impaired before plaintiffs agreed to invest in Octonion, and that given the precipitous decline in the value of the assets, plaintiffs' investment was severely impaired *ab initio*.

        *1. The Adequacy of the Citigroup Defendants' Warnings*

Plaintiffs argue that the warnings contained in the Offering Circular and accompanying documents reviewed by plaintiffs prior to their investment in Octonion were incomplete warnings and inadequate under current law. Plaintiffs are incorrect.

Plaintiffs essentially plead "fraud by hindsight," which is not actionable under the securities laws. *See Novak*, 216 F.3d at 309 (stating that the Second Circuit has "refused to allow plaintiffs to proceed with allegations of "'fraud by hindsight'" (quoting *Stevelman v. Alias research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999)); *In re Sierra Wireless Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 373 (S.D.N.Y 2007) (same). Plaintiffs have not pled any facts to suggest that the performance or selection process for the allegedly worthless assets for Octonion was materially different from the performance or selection process for the other assets in Octonion's portfolio. Plaintiffs rely on the fact that valuations provided by Citigroup from June through October 2007 on their investment showed declines and that their equity investment ultimately lost significant value. These allegations, however, are lacking in one major respect: they say nothing about the worth of the assets in March 2007. While great clairvoyance may have predicted the upcoming market difficulties, failure to make such predictions does not constitute fraud. *Denny v. Barner*, 576 F.2d 465, 470 (2d Cir. 1978).

In addition, to the extent that plaintiffs claim that defendants engaged in fraud by adding assets previously owned and unsold by Citigroup, this allegation fails to state a claim because such facts were disclosed explicitly to plaintiffs in the Offering Circular provided to plaintiffs prior to their investment in Octonion.  The Offering Circular expressly provided that the assets "*will* be purchased from a portfolio . . . held by Citigroup pursuant to a warehouse facility" that may include assets "acquired by Citigroup . . . in connection with its underwriting" of other securitizations.  (Ex. 4 to King Decl. at 43 (emphasis added).)   In addition, the Offering Circular warned investors that it would be difficult to "liquidate their investment at any particular time" because there "is currently no market" for the Octonion CDO securities, and it thus would be difficult for "Holders of the Notes to determine the value of the Notes at any particular time." (*Id.* at 29.)  In light of these stated risks, the Offering Circular instructed investors "to conduct an independent investigation of the risks posed by an investment in the Notes" and to "rely on their own examination of the co-issuers and the terms of the offering, including the merits and the risks involved." (*Id.* at v-vi.)

Plaintiffs cannot sustain a claim for securities fraud based on actions that the defendants specifically said they would take in the future in the Offering Circular because nothing about the language in the Offering Circular was misleading.  To the extent that plaintiffs made a bad business decision by investing in Octonion, doing so does not entitle them to relief under the securities laws.

### 2. *Scienter*

Plaintiffs also claim that defendants purposely overvalued the assets that were included in Octonion while knowing the entire time that they really were worth less than estimated.  However, plaintiffs have not set forth facts indicating that defendants knew that the assets in CGMI's warehouse were worth less at the time of the Octonion transaction.  That defendants later revalued the assets after they were included in Octonion does not mean that these assets were initially overvalued.  As set forth above, in order to survive a motion to dismiss, plaintiffs must plead (a) "facts to show that defendants had both motive and opportunity to commit fraud" or (b) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit*, 264 F.3d 131at 138.

9

Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable . . . do not constitute motive under the securities laws. *ECA & Local 134*, 553 F.3d at 198 (citing *Novak*, 216 F.3d at 307). Plaintiffs have not alleged motive that is different from the motives that all corporate officers and directors have—that is, a desire for the company to remain profitable and to profit personally as a result of the company's profitability. Therefore, to the extent that plaintiffs plead scienter, they must do so under the "recklessness" prong.

Plaintiffs' allegations do not raise a strong inference of scienter, because plaintiffs do not allege that the defendants engaged in conduct that was "highly unreasonable" or conduct that represented an "extreme departure" from the standards of ordinary care to the extent that the danger was either known to the defendants or so obvious that the defendants must have been aware of it. *Kalnit*, 264 F.3d at 142. Essentially, plaintiffs simply disagree with defendants' valuation methods, which does not equate to alleging fraud. *In re Allied Capital Corp. Sec. Litig*, No. 02 Civ. 3812, 2003 U.S. Dist. LEXIS 6962, at *12-13 (S.D.N.Y. Apr. 21, 2003). Accordingly, plaintiffs have failed to demonstrate a strong inference of scienter—i.e., "an inference that is cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

### 3. *Allegations Against Harding and Chau*

Plaintiffs' second claim is that Harding and Chau made misleading statements of material fact with respect to the investment approaches employed by Harding, and that instead of performing legitimate analysis, Harding engaged in a scheme with the Citigroup Defendants to assist Citigroup in offloading its worthless assets onto plaintiffs. (Compl. ¶¶ 48-49.) That claim also fails.

Plaintiffs have not stated with any specificity why Harding's misstatements were false or misleading or that plaintiffs relied on Harding's statements when they made the decision to invest in Octonion. The statements that plaintiffs contend were materially misleading are "too general to cause a reasonable investor to rely upon them." *ECA & Local 134*, 553 F.3d at 206. In addition, plaintiffs have not pled adequately that someone whose intent can be imputed to Harding acted with the intent to defraud or mislead plaintiffs.

B. Section 20(a) Claims

In addition to their section 10(b) and Rule 10b-5 claims, plaintiffs also allege control person liability against the individual defendants pursuant to section 20(a) of the Exchange Act. As discussed above, plaintiffs have not alleged adequately any underlying violation. Thus, plaintiffs cannot state a claim for control person liability against the individual defendants, and plaintiffs' claims brought pursuant to section 20(a) of the Exchange Act are therefore dismissed. *See Vladimir v. Bioenvision, Inc.*, 606 F. Supp. 2d 473, 496 (S.D.N.Y. 2009) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).

C. State Law Claims

Because the Court grants the motions to dismiss plaintiffs' complaint with respect to the securities fraud claims, it declines to exercise its supplemental jurisdiction over plaintiffs' remaining state law claims. *See* 28 U.S.C. 1367(c)(3); *Baylis v. Marriott Corp.*, 843 F.2d 658, 665 (2d Cir. 1988). Accordingly, plaintiffs' remaining state law claims are also dismissed.

## III. CONCLUSION

Because plaintiffs have not alleged that any defendant made actionable misstatements with the requisite level of scienter, they have failed to state a claim upon which relief can be granted. Accordingly, defendants' motions to dismiss the complaint pursuant to Rule 12(b)(6) are granted with prejudice with respect to the securities fraud claims and without prejudice with respect to the state law claims. The Court does not address defendants' argument that the claim is time barred because it grants the motions on other, independent grounds.

Dated: New York, New York
April 28, 2010

Sidney H. Stein, U.S.D.J.

11